**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF FLORIDA
PENSACOLA DIVISION**

UNITED STATES OF AMERICA

v.                                                                Case No.: 3:04CR74/RV

JAMES A. SHARPE,
a/k/a Jimmy Sharpe,
JACQUELINE ANNE SHARPE,
a/k/a Anne Sharpe, and
DAVID W. STUART

_____

**ORDER**

The Defendants, James A. Sharpe, Jacqueline Anne Sharpe, and David W. Stuart, were found guilty as charged in the indictment by a jury on October 22, 2004. At the close of evidence in the case, but before the case was submitted to the jury for verdict, each Defendant made a Motion for a Judgment of Acquittal, which was denied by this court. Following the jury's verdict, Jacqueline Anne Sharpe timely filed a written post-verdict Motion for a Judgment of Acquittal under Rule 29(c) of the Federal Rules of Criminal Procedure. Because I then granted a dismissal of the indictment on other grounds as to all three Defendants, a dismissal which has now been reversed, her Rule 29 motion was not ruled upon. That motion remains pending, and the other two Defendants seek to have that motion deemed applicable to them, too.

**I.      FACTUAL BACKGROUND**

This is a complicated case in many ways: legally, factually, and procedurally. Defendant James A. Sharpe, Sr. ("Sharpe") is a former college and professional football coach and, in recent years, a real estate developer in the Destin, Florida, area.

In October of 2003, he was indicted in a separate matter, along with his son, James A. Sharpe, Jr., and his daughter, Shannon Sharpe Carr, on a variety of charges relating to his real estate business. In February of 2004, Sharpe, pursuant to a plea agreement, pled guilty to three counts of making false statements to financial institutions in violation of Title 18, United States Code, Section 1014. As a part of this agreement, Sharpe agreed to be held liable for purposes of loss and restitution for all relevant conduct relating to the indictment. Mr. Sharpe's son and daughter also each entered a plea of guilty to a single count of making false statements to a financial institution in violation of Section 1014.

The 2003 indictment included allegations that a parcel of commercial property on highway U.S. 98, in front of the Emerald Lakes subdivision in Destin, Florida ("Emerald Lakes property"), had been obtained by fraud and was thereby forfeitable. The Emerald Lakes property was not owned by Sharpe, but by Four Star, LLC, a Florida corporation that Sharpe managed and in which he legally had a 25% equitable ownership.[1] After some negotiation, the government and the defendants in the 2003 case agreed to the appointment of a receiver to locate, take possession, and manage the assets relating to the case. It was also agreed that most of the property would be liquidated. This agreement was incorporated into a stipulated order submitted to, and entered by, this court on November 21, 2003 ("November order"). The November order provided, in relevant part, that:

> 1. [P]ending resolution of this case, [James A. Sharpe, Sr., James A. Sharpe, Jr., and Shannon Sharpe Carr], their agents, servants, employees, attorneys, family members, and those persons in active concert or participation with them, are ORDERED not to sell, assign, pledge, distribute, give away, encumber, remove from the jurisdiction of this court with the intent to conceal or hide, or otherwise participate in the disposal

---

[1] Sharpe operated his developing business through a series of corporate entities. The outstanding shares of stock in J.A.S. Coastal Realty, Inc. ("J.A.S. Realty"), and Asset Resource Management ("A.R.M.") were each owned 50% by Sharpe and 50% by Mrs. Sharpe, with Sharpe serving as President and Director. Four Star, LLC ("Four Star"), which Sharpe managed, was 50% owned by Asset Resource Management, and 50% by an unrelated investor. Thus, Sharpe's legal ownership interest in Four Star, LLC, was equal to one-half of A.R.M.'s one-half, or 25%.

of, or attempt or take any actions that would affect or diminish the value or marketability of the following property: [a listing of 10 assets [(a) through (j)], including (d), their "interest" in the Emerald Lakes property ].

\* \* \*

2. In accordance with the agreement reached by the parties, the defendants are authorized to sell or dispose of the property listed in paragraph d above [the Emerald Lakes property], after consultation with and approval of the United States Attorney.

IT IS FURTHER ORDERED that Michael J. Quilling, Esq. ("Receiver"). . . be and hereby is appointed as Receiver to identify and trace financial assets of defendants James A. Sharpe, Sr. . . . The Receiver is further authorized to take possession of and manage the seized assets. . . <u>and any proceeds obtained by any of the defendants as a result of the sale of [the Emerald Lakes property], pending further order of this court</u>.

(Appendix 1, at 1-3) (emphasis added).

This order was supplemented and expanded by a second stipulated order submitted to, and entered by, this court on March 11, 2004 ("March order"). The March order gave the Receiver the authority to liquidate Sharpe's and his Co-defendants' assets, to locate potential claimants, and to distribute funds to Sharpe's victims and creditors. The March order further provided that:

IT IS ORDERED that the defendants, their agents, servants, employees, attorneys, family members, and those persons in active concert or participation with them, are ordered not to sell, assign, pledge, distribute, give away, encumber, remove from the jurisdiction of this Court with the intent to conceal or hide, or otherwise participate in the disposal of, or attempt to take any actions that would affect or diminish the value or marketability of any property subject to forfeiture belonging to, or controlled by the defendants, in whole or in part. . . the following property: [lists six described items of real or personal property, including the Defendants' "interest" in the Emerald Lakes property].

\* \* \*

IT IS FURTHER ORDERED that James A. Sharpe, Sr., James A. Sharpe, Jr., and Shannon Sharpe Carr, their agents, servants, employees, attorneys, family members, and those persons in active concert or participation with them, shall immediately identify and turn over possession to the Receiver, all the property described above which is in their possession or under their control.

>IT IS FURTHER ORDERED that no other person or entity claiming the right to possess or operate or make decisions with respect to any Receivership Assets shall exercise any of their claimed rights or powers with respect to the Receivership Assets until further order of the Court.[2]

(Appendix 2, at 1, 4-5).

The March order was intended to partially facilitate the sale of the Emerald Lakes property. Although the property had a large mortgage which was in default and the mortgage note had default penalty provisions which were rapidly eroding Sharpe's equity in the property, a prompt sale would allow the Receiver to receive Sharpe's remaining equity in the property. At the time of the March order, Sharpe told the Government that he tentatively had a buyer for the property. As part of the preparations for this sale, Sharpe later said that he had entered into an "Exclusive One Time Listing Agreement" with David W. Stuart.[3] Stuart is a friend and sometimes business associate of Sharpe's, who at the time headed up the commercial sales division of Abbott Realty Services, Inc. ("Abbott Realty"). Stuart and Sharpe had worked together on several real estate development sales, in which the usual practice was for Abbott Realty to receive a 10% commission on a sale made by Stuart, of which 2% would be shared with and allocated to J.A.S. Realty, the real estate sales company owned by the Sharpes[4] and utilized by Mr. Sharpe to list his real estate properties.[5] Stuart also usually received an additional ½ of 1% as a "consulting fee," apparently for his additional advice on the development and marketing of the property. Stuart's arrangement with Abbott Realty resulted in Stuart usually receiving about

---

[2] It should be noted that, whereas this last provision refers to "person or entity," all other provisions in the March and November orders refer simply to "persons," indicating that it those provisions, only real persons and not corporate entities are meant.

[3] The Government believes, and the evidence supports its belief, that this Agreement was probably prepared sometime later and backdated.

[4] As noted infra, Mr. and Mrs. Sharpe each held ownership of 50% of the outstanding shares of J.A.S. Realty. Mr. Sharpe served as President and Director of J.A.S. Realty.

[5] In the real estate business, it is the usual practice for the selling agent and the listing agent to share the sales commission.

70% of Abbott's net 8% fee. Thus, Stuart would usually personally receive a fee of about 5.6% (70% of Abbott's 8%), and 0.5% (for "consulting") on these sales, or a total of about 6.1%. According to the Exclusive One Time agreement, however, Sharpe, as the manger of Four Star, agreed to pay Abbott Realty a $30,000 flat fee upon the sale of the Emerald Lakes property. Neither the Government nor the Receiver was told about the "Exclusive One Time" agreement.

Although the original buyer of the Emerald Lakes property backed out of the sale, Stuart was able to quickly find another buyer willing to pay $1,750,000 for the property. The new buyer needed property that would qualify for a tax-free exchange, and had only a short period of time remaining in which to consummate the transaction. In lieu of this hastily-arranged sale by Stuart, the Emerald Lakes property would most certainly have been foreclosed, eliminating any equity of Sharpe's (or funds from the sale to the Receiver) in the property. The property sale was actually closed on June 10, 2004, for $1,750,000. The closing was handled by attorney Michael Mead's office in Ft. Walton Beach, Florida. Acting on instructions from Stuart, the closing attorney distributed $30,000 to Abbott Realty as a sales commission (equal to about 1.71% of the sales price), and distributed $153,750 (equal to about 8.79% of the sales price) to Stuart as a "consulting fee." These funds were deducted from the $1,750,000 in proceeds from the sale of the Emerald Lakes property, along with payment of the in-default mortgage and its accrued interest and penalties and the other closing expenses. Mead's office notified Sharpe of the various payments and deductions. The closing attorney then sent the remaining net proceeds via Federal Express to the Receiver in Dallas, Texas. The Receiver had not previously been told of Stuart's consulting fee, but rather was informed by Sharpe that the total sales commission would be around 10 to 10½%. In commercial real estate sales, a sales commission of about 10% is common, and the Receiver felt it was reasonable. The total of the two fees did equal 10.5% of the sales price. However, upon learning of that most of the fee was characterized as a "consulting fee" paid to Stuart, the

Receiver immediately contacted the Government and expressed grave concern.

Stuart received and deposited his $153,750 "consulting fee" check into his SunTrust Bank account. He then wrote a $35,000 check to Jacqueline Anne Sharpe ("Mrs. Sharpe"), Sharpe's wife, as a "loan." Mrs. Sharpe took her $35,000 check to SunTrust Bank, and exchanged it for four separate $8,000 cashiers checks and $3,000 in cash. The unusual nature of this request prompted Kathy Sue King, the teller coordinator for SunTrust Bank, to inquire as to the transaction's purpose. According to King's trial testimony, Mrs. Sharpe claimed that she was working on a development deal with Stuart, and that it was easier to convert the checks for payout in the smaller denominations. Mrs. Sharpe then separately and sequentially deposited three of the four $8,000 checks into her personal checking account, and on each occasion paid some of the Sharpe's financial obligations for attorney's fees and other matters. At trial, Mrs. Sharpe's testified that she did this out of fear that the government would seize the money, since the government had already seized their bank accounts and all assets of Sharpe and his operating entities.

Around the same time, Abbott Realty paid Stuart $19,480.50 as his share of the $30,000 commission received from the sale of the Emerald Lakes property. Abbott Realty had not been told that Stuart would receive a separate "consulting" fee. Upon reviewing the closing statement and learning of the consulting fee, Stuart's supervisor, Carmela Bell, asked Stuart about the money. Stuart stated that the $153,750 was not related to the real estate closing, and had nothing to do with Abbott Realty. According to Bell's testimony, Stuart also stated that he had structured the deal to include a "consultant" fee in order to help Sharpe.

The combination of these three events (the Receiver's concerns over the large "consulting fee"; Abbott Realty's concern over how the sales commission was allocated; and the bank's concern over Mrs. Sharpe's four cashier's checks) led the Government to investigate and eventually to pursue criminal charges against Mr. and Mrs. Sharpe and Mr. Stuart. They were indicted on charges of mail fraud and

conspiracy to commit money laundering in July of 2004,[6] and went to trial in October 2004.

At trial, the Defendants maintained that the $35,000 check written by Stuart to Mrs. Sharpe was actually a legitimate loan (like a previous loan personally made to her by Stuart). The Government, however, argued that the funds, being exactly 2% of the $1,7500,000 sale, were a kickback for money that Sharpe, via the J.A.S. Realty listing commission, otherwise would have received from the Emerald Lakes sale. At the close of the Government's case, the Defendants each made oral motions for judgment of acquittal premised on the idea that the $35,000 represented a loan. These motions were denied.

All three Defendants then testified that the $35,000 check to Mrs. Sharpe by Stuart was a loan. Mr. Sharpe testified that he had borrowed money from friends many times in the last few years, that he had borrowed money from Stuart in the past, and that Stuart had previously loaned Mrs. Sharpe $10,000 in November 2003, for which she had signed a promissory note. Mrs. Sharpe testified in detail about typing a promissory note in which she promised to repay the $35,000 to Stuart by June 14, 2005. Stuart testified that he expected to be repaid, and that the loan was not related to any real estate transaction.

At the close of all evidence, the Defendants each renewed their motions for judgment of acquittal, again arguing that the $35,000 was a loan. These motions were denied. The Defendants made oral motions for a judgement of acquittal on this basis a third time when the jury indicated that it might be deadlocked, which were also denied. The Defendants were found guilty as charged in the two-count indictment on October 22, 2004.

Seven days after the verdict was returned, Mrs. Sharpe filed a motion for Judgment of Acquittal under Rule 29(c). Neither Mr. Sharpe nor Mr. Stuart filed a

---

[6]While the indictment charged all three Defendants with conspiracy to commit money laundering (Count II of the indictment), only Stuart and Sharpe were charged with mail fraud (Count I of the indictment).

post-verdict motion for judgment of acquittal. Mrs. Sharpe's motion argued that the government had failed to prove beyond a reasonable doubt that Sharpe and Stuart had committed mail fraud, and, therefore, that the $35,000 check Mrs. Sharpe received from Stuart could not have constituted proceeds from a specified unlawful activity, as required for money laundering.[7] Specifically, the motion argued that the $35,000 was a personal loan from Stuart, not a commission on the sale of the property. At no point did the motion explicitly argue that the money represented a commission to J.A.S. Realty which was outside the scope of the two court orders and not required to be paid to the Receiver.

At sentencing, all three Defendants made, for the first time, oral motions to vacate the charges and jury verdicts on the basis that since J.A.S. Realty was a separate corporation, and was not expressly encompassed within the scope of the November and March orders, the Defendant's actions had not been in violation of the November and March orders, and there was no legal basis for either charging them in the indictment or finding them guilty of mail fraud or money laundering. After considering the matter, I concluded that the Defendants' motions did raise an issue as to the sufficiency of the indictment in this case. The mail fraud and money laundering were based upon an asserted violation of the two court orders, but since those orders did not legally prohibit the conduct underlying the mail fraud and money laundering, the indictment did not charge any conduct that could legally be either mail fraud or money laundering. Therefore, I entered an order dismissing the indictment under Rule 12(b)(3)(B) as failing to "state an offense."

Earlier this year, the Eleventh Circuit Court of Appeals reversed this order. The Eleventh Circuit did not disagree with the underlying rationale of my order. However, the court held that "it is clear that in dismissing the instant indictment the district court considered the overall sufficiency of the evidence presented by the government

---

[7] Since Mrs. Sharpe was only charged in Count II, the money laundering count, her motion did not directly challenge the validity of the mail fraud count.

at trial, according particular weight to the language of the receivership orders, which were presented as evidence at trial and were not part of the indictment." United States v. Sharpe, 438 F.3d 1257, 1263 (11th Cir. 2006). The court also noted that Mrs. Sharpe's written motion for judgment of acquittal, which was timely filed, was still pending. The case was remanded to this court for resentencing, and a new sentencing hearing was set.

At the new sentencing hearing, all three Defendants argued that the still-pending motion for judgment of acquittal for Mrs. Sharpe as to Count II of the indictment should be granted, and that the motion should be considered as having been "joined in" by Mr. Sharpe and Stuart. Given the complexity of the issues involved, I continued the sentencing hearing in order to give the parties an opportunity to thoroughly brief the matter.

**II.    DISCUSSION**

    A.    Rule 29 Standard

The standard for a motion for a  judgment of acquittal under Rule 29(c) is whether "viewing all the evidence in the light most favorable to the Government and drawing all reasonable inferences and credibility choices in favor of the jury's verdict, a reasonable trier of fact could find that the evidence established guilt beyond a reasonable doubt."  United States v. O'Keefe, 825 F.2d 314, 319 (11th Cir. 1987). This standard is the same as for reviewing the sufficiency of the evidence to sustain a conviction. United States v. Sellers, 871 F.2d 1020 (11th Cir. 1989).  It is not necessary for the evidence to exclude every reasonable hypothesis of innocence or be wholly inconsistent with every conclusion except that of guilt, provided a reasonable trier of fact could find that the evidence establishes guilt beyond a reasonable doubt. Id., at 1021.

    B.    Factual Sufficiency

The Defendant's argument, now as before, is that the Defendants cannot have committed mail fraud in this case, because the $35,000 paid to Mrs. Sharpe

represented a sales commission owed to J.A.S. Realty, and therefore not encompassed within the March and November orders.[8] The Defendants admit that they thought at the time that the $35,000 was owed to the Receiver, because they failed to take account of the fact that J.A.S. Realty was a separate and distinct legal entity from Sharpe. They now argue that they were incorrect in this, however, and that the mere fact they thought they were doing something illegal does not render their conduct actually illegal. See, e.g., United States v. Berrigan, 482 F.2d 171 (3rd Cir. 1973) (recognizing defense of legal impossibility where intended conduct, even if completed, would not amount to a crime).[9]

Under Rule 29 of the Federal Rules of Criminal Procedure, motions for a judgment of acquittal must be made within seven days after the jury is discharged or within such further time as the court may fix during the 7-day period. Rule 45(b)(2) of the Federal Rules of Criminal Procedure [as it read in 2004] further provided: "The [district] court may not extend the time for taking any action under Rules 29, 33, 34, and 35, except as stated in those rules." Therefore, a district court lacks the authority to grant a Judgement of Acquittal on a motion filed outside the time requirements of Rule 29(c). Carlisle v. United States, 517 U.S. 416, 116 S. Ct. 1460, 134 L. Ed. 2d. 613 (1996); United States v. Gupta, 363 F.3d 1169 (11th Cir. 2004).

Since this seven-day period has long since elapsed, the Defendants cannot now make motions for a judgment of acquittal based on the J.A.S. Realty argument. However, seizing upon the fact that Mrs. Sharpe's timely-filed written Rule 29 motion is still pending, the Defendants now contend both that the J.A.S. Realty argument should be imputed to Mrs. Sharpe's written motion, and that Mr. Sharpe and Stuart should be held to have implicitly joined in that motion. This contention has serious problems, however.

---

[8] And, since in this case mail fraud is a necessary predicate for the conspiracy to commit money laundering charge, the Defendants cannot be found guilty on that count either.

[9] The details of this argument are set out more fully in my previous order granting the Defendant's motions for judgment of acquittal. (Doc. 62)

To begin with, Mr. Sharpe and Stuart cannot be held to have implicitly joined in Mrs. Sharpe's Rule 29 motion. It is a common practice in multi-defendant trials to construe an oral objection or motion made by one defendant during the trial as made by all defendants, unless it is specifically disclaimed by a co-defendant or is plainly not applicable to all. See United States v. Williams-Davis, 90 F.3d 490, 510 (D.C. Cir. 1996) (allowing defendants to "free ride" on objections made by similarly situated co-defendants at trial); United States v. Salinas, 601 F.2d 1279 (5th Cir. 1979) (same). I ordinarily follow this practice and announce it to all parties on the record at some point in the trial when the occasion arises. This procedure helps the trial flow more smoothly by preventing the needless repetition of each defendant orally joining in each time. However, this rationale does not apply in the case of post-trial motions, and particularly to written motions for judgment of acquittal. United States v. Cunningham, 145 F.3d 1385 (D.C. Cir. 1998); see also, United States v. Weisman, 624 F.2d 1118, 1127 (2nd Cir. 1980) abrogation on other grounds recognized by Ianniello v. United States, 10 F.3d 59 (2nd Cir. 1993) ("[t]he district court's practice of treating motions made by one defendant during trial as covering all defendants cannot logically be extended to particularized requests after trial by a single defendant"). Thus, Mr. Sharpe and Stuart cannot be deemed to have joined in Mrs. Sharpe's Rule 29 motion.

Similarly, Mrs. Sharpe's Rule 29 motion simply did not raise the J.A.S. Realty issue, even implicitly. There is not even a hint in Mrs. Sharpe's motion of the argument that the $35,000 represented a sales commission to J.A.S. Realty as a separate entity outside the March and November orders. In fact, the arguments actually made by the motion are inconsistent with this position. In keeping with the Defendant's position prior to the original sentencing, Mrs. Sharpe's Rule 29 motion argues the that $35,000 check represented a personal loan from Stuart, and challenges the sufficiency of the evidence supporting the jury's verdict. Clearly, the $35,000 could not have represented both a loan to Mrs. Sharpe and a sales commission to J.A.S. Realty. Defendants are certainly allowed to make arguments in the alternative, even where

those arguments may be inconsistent with each other. See Fed. R. Civ. Pro. 9(e)(2). They can even supplement the argument made in the original motion. However, a timely-filed Rule 29 motion cannot simply be used as a protective "place holder" for whatever argument a defendant later decides to make. Thus, the focus must be upon the Defendants' arguments set out in the Rule 29 motion, as filed.

More fundamentally, even if Mrs. Sharpe's Rule 29 motion were a proper vehicle for the Defendant's new argument, that argument seems to have been foreclosed by the Eleventh Circuit's opinion in United States v. Sharpe, 438 F.3d 1257 (11th Cir. 2006). In my previous order, I treated the March and November orders as setting the legal standard for the Defendants' actions, analogous to a criminal statute. Mail fraud requires illegal conduct, and whether that conduct was illegal must be determined in this case by whether it complied with the two court orders. In sum, I concluded that the interpretation and construction of my two court orders was a legal issue for determination by the judge and not a factual matter for the jury to decide. The Eleventh Circuit disagreed with this analysis, holding that the orders were factual evidence, rather than being a legal prerequisite to the indictment. Id., at 1263 ("[a]fter review of the record, it is clear that in dismissing the instant indictment the district court considered the overall sufficiency of the evidence presented by the government at trial, according particular weight to the language of the receivership orders, which were presented as evidence at trial and were not part of the indictment.") It appears that the Eleventh Circuit treated the two orders as much like a contract, the interpretation of which is left to the jury, rather than as the legal basis for the charges. See General Wholesale Beer Co. v. Theodore Hamm, 567 F.2d 311 (5th Cir. 1978) (interpretation of contract terms is left to the jury).

Under law of the case principles, the Eleventh Circuit's determination that the two court orders are factual evidence makes the interpretation of those documents a matter of fact rather than a matter of law. As a factual question, the proper interpretation of the two court orders is a matter left to the province of the jury, which

is free to choose among differing constructions of the evidence. <u>United States v. Hardy</u>, 895 F.2d 1331 (11th Cir. 1990); <u>see also</u> <u>United States v. Miranda</u>, 425 F.3d 953, 962 (11th Cir. 2005) ("[t]he sole ground for a post-trial motion under Rule 29(c) is that the evidence was insufficient to sustain a conviction.") Therefore, I cannot disturb the jury's verdict in this matter except on ordinary sufficiency of the evidence grounds.

Construed as an attack on the sufficiency of the evidence, the Defendants' argument must fail. The Defendants introduced no evidence at trial supporting the theory that the $35,000 check from Stuart to Mrs. Sharpe was really a 2% sales commission owed to J.A.S. Realty and that J.A.S. Realty was not covered by the two court orders. Not only did the Defendants not even advance such a theory at trial, the arguments made that the $35,000 represented a personal loan are inconsistent with this theory. Jurors are not experts in corporate law, who can detect the nuances in a court order and understand the distinction between a person and a corporation owned by that person, especially when there has been virtually no evidence or argument on the issue. As I observed when I denied the Defendants' previous motions for judgment of acquittal, the trial record contains ample evidence from which the inference could reasonably be drawn that the $35,000 represented money that otherwise would have gone to the Receiver and that was owed to the Receiver under the November and March orders. As a factual matter within the purview of the jury, the jury's verdicts are fully supported by the record and the motion for a judgment of acquittal raising this issue must be denied.

### III. CONCLUSION

For the foregoing reasons, Mrs. Sharpe's motion for judgment of acquittal (Doc. 49) is DENIED. Mr. Sharpe and Stuart's motions to join in Mrs. Sharpe's motion for judgment of acquittal are also DENIED. A sentencing hearing will be set for all three Defendants by separate notice.

DONE and ORDERED this 15th day of August, 2006.

 /s/ *Roger Vinson*
**ROGER VINSON**
**Senior United States District Judge**